IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 29, 2020

**STATE OF TENNESSEE v. ROBERT MICHAEL WOLFENBARKER**

**Direct Appeal from the Criminal Court for Carter County**
**No. 24815B          Lisa N. Rice, Judge**

_____

**No. E2019-01386-CCA-R3-CD**

_____

The Defendant, Robert Michael Wolfenbarker, pleaded guilty to one count of theft of property valued at more than $60,000 but less than $250,000, two counts of theft of property valued at more than $2,500 but less than $10,000, one count of theft of property valued at $1,000 or less, one count of attempted auto burglary, and one count of vandalism. The trial court sentenced the Defendant to nine years of confinement. On appeal, the Defendant contends that the trial court erred when it sentenced him. After review, we affirm the Defendant's sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jeffrey C. Kelly, District Public Defender; and Wesley K. Taylor, Assistant Public Defender, Elizabethton, Tennessee, for the appellant, Robert Michael Wolfenbarker.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Kenneth C. Baldwin, District Attorney General; and Matthew Roark, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**Facts**

This case arises from a theft from multiple victims at one location.[1] By presentment, a Carter County grand jury charged the Defendant and a co-defendant, G.C. Lingerfelt, with one count of theft of property valued at more than $60,000 but less than

---

[1] The record on appeal does not include a transcript of the guilty plea. As such, we will summarize the facts supporting the conviction using other documents included in the technical record.

$250,000, two counts of theft of property valued at more than $2,500 but less than $10,000, one count of theft of property valued at $1,000 or less, one count of attempted auto burglary, and one count of vandalism. Count One of the presentment alleged that the defendants exercised control over a car hauler, 1989 Mustang LX, golf cart, generator, air compressor, tools, battery charger, and racing fuel, all of which were the property of Norman Markland, and which had a total value of more than $60,000 but less than $250,000. Count Two of the presentment alleged that the defendants exercised control over wheels and tires, the property of Dale Forrest Minton, valued at more than $2,500 but less than $10,000. Count Three alleged that the defendants committed burglary by knowingly entering an automobile, the property of Tyler Austin Hines, without the owner's effective consent and to commit a theft. Count Four alleged that the defendants exercised control over property including various auto parts, which were the property of Tyler Austin Hines, valued at more than $2,500 but less than $10,000. Count Five alleged that the defendants exercised control over various auto parts, which were the property of Craig Ingram, that were valued at $1,000 or less. Count Six of the presentment alleged that the defendants attempted auto burglary by knowingly attempting to enter a box trailer, the property of the Carter County Car Club, without consent and with the intent to commit theft. Count Seven alleged that the defendants committed vandalism by knowingly causing damage to property, namely fencing, valued at $1,000 or less.

The Defendant pleaded guilty to the offenses for which he was charged. In anticipation of the sentencing hearing, a presentence investigation report was created. Included in that report was the following statement from law enforcement:

On 08/20/2017 at 0938 hours, I was dispatched to 1447 Highway 19E (Fatboy Fabrications) in reference to a burglary. Upon arrival, I made contact with the victim, Norman Markland. Mr. Markland advised me he dropped off his white 2000 Shadow 24 foot trailer . . . at approximately 2000 hours on 08/19/2017. Mr. Markland then informed me while on his way to church at approximately 0935 on 08/20/2017, he noticed his trailer was missing. Mr. Markland estimated the trailer to be valued around $2,500.00. Mr. Markland stated when he pulled into Fatboy Fabrications, he noticed the lock appeared to be broken and the gate was open. The trailer is manufactured out of Bristol, . . . and has black powder coated rims with a 4 foot door on the side. Mr. Markland stated inside the trailer was a 1989 custom grey Ford Mustang drag car . . . . estimated at $60,000.00. Mr. Markland then informed me that the trailer also contained several other contents including a golf cart, a generator, an air compressor, a battery charger, multiple craftsman tools, and 4 fuel containers for a total value of approximately $3,550.00. The owner of Fatboy Fabrications, Dale Minton,

arrived on scene and noticed two customer vehicles as well as his personal vehicle were burglarized. A second 1989 silver Ford Mustang was left sitting on wooden blocks with the wheels and tires missing. The silver mustang was also missing the gauge cluster as well as the ignition switch. Mr. Minton then advised me his personal 2001 white Ford Excursion SUV was also missing all 4 wheels and tires and the vehicle was sitting on wooden blocks. Mr. Minton then informed me a 1988 red Ford Mustang was missing 9 wheel spacers, and most of the lug nuts were off the wheels. While searching the scene for any other missing property, Mr. Minton noticed the Carter County Car Club trailer door was open. Mr. Minton stated the door to the trailer was shut and locked. The missing door was pried open, but nothing appeared to be missing from the trailer. Officers inspected the vehicles and other property items for traces of evidence. Officers observed a hood on a blue mustang that appeared to have a hand print in the dust. It was evidence that the suspects used gloves when no finger prints were visible.

The report went on to recount that no surveillance footage was found and that the stolen vehicles and trailer, both registered in Tennessee, were entered into a computer database as stolen.

A summary from an investigator investigating the case, Todd Hamm, stated that Investigator Hamm had met with Mr. Markland, who provided him with a more detailed list of the items that were stolen. Mr. Markland also gave to him the several serial numbers for parts that were installed on his custom 1989 Mustang drag car. These items were also entered into the database and marked as stolen. The investigator stated that, in May 2018, Mr. Markland informed him that he had obtained video recordings from several locations along 19E that indicated that the suspect pulled the trailer through Roan Mountain and into North Carolina at around 3:30 a.m. on August 20, 2017 using a dark colored pickup truck. The investigator sent notices to the North Carolina Department of Motor Vehicle License and to the theft bureau for assistance in looking for the trailer and its contents. Investigator Hamm said that Chris Cook, with the theft bureau, received information that revealed that co-defendant Lingerfelt and the Defendant, both of whom live in North Carolina, were responsible for the theft. The investigator said that he learned that the defendants entered the lot by cutting the chain-link fence at the rear of the lot. They then stole the parts from the customer's vehicles inside the lot as well as the trailer and its contents.

At the sentencing hearing, the trial court summarized the case saying that the Defendant had pleaded guilty on March 26, 2019, in exchange for a sentence of nine years to be served as a Range I offender at 30%. The trial court admitted the victim

impact statements and also a statement from Ms. Kim Wolfenbarker, the Defendant's mother, into the record.

The Defendant testified and admitted his guilt and expressed remorse. The Defendant said he was unmarried and had a two-year-old daughter who lived with his mother and aunt in Rockford, Illinois. He said that he had achieved an 8th grade education, dropped out of school, but went on to complete his GED and attend college. The Defendant testified that, if given an alternative sentence, he would seek employment as a carpenter and painter and begin paying the restitution that he owed. He wanted to "mak[e] things right."

The Defendant testified that he had a history of drug use, namely heroin and methamphetamine, which led to his committing these offenses.

During cross-examination, the Defendant testified that he had a history of criminal convictions, including conspiracy to commit grand larceny for which he served a five year sentence. He further agreed that he had another larceny conviction from 2007 and that, in 2011, he had been convicted of felony breaking and entering. He had also had his parole revoked on at least one occasion. The Defendant again attributed these to his drug problem and said that he never sought treatment because he never had "the chance of getting it." The Defendant agreed that it was a short period of time between when he was released from incarceration and when he recidivated. He stated that, this time, he had more of a "support system."

The Defendant agreed that he "told [the court] quite a bit when he pled guilty" and was "forthcoming." The Defendant agreed that the victims were targeted for these offenses by his co-defendant. He agreed that this offense was well thought-out and part of a plan. He contended, however, that his co-defendant was the one that thought out the plan. The Defendant said he made a "bad" decision to support his one gram per day heroin habit.

Upon questioning from the trial court, the Defendant testified that he had been recruited to help with a "job," to steal items. One of his fellow employees approached him at work and said that he knew someone who needed help with a job. The fellow employee introduced the Defendant to co-defendant Lingerfelt. Co-defendant Lingerfelt informed the Defendant that he had a job for him if the Defendant wanted to make some extra money. Co-defendant Lingerfelt asked if the Defendant wanted to drive with him to a different state, load up some items, and drive back. The Defendant did not know the details of the plan until the drive down to steal the items.

Based upon this evidence, the trial court found:

[The Defendant has] lived in numerous locations and he has been arrested and/or convicted in those states. One, he wasn't actually paroled on a one to ten-year sentence and he did not comply with the conditions of release, the parole was revoked and he was required to serve his sentence. He has no problems as far as his mental, physical or social history that has been brought to the Court's attention. The report indicates that he got his GED I guess when he was in jail. He went to college, got his GED at some point, went to college, had numerous education opportunities and technical and vocational opportunities. One of the prior comments was that he had planned to get his HVAC or mechanical engineering degree after he was released from jail but he didn't talk anything about that today. He never participated in a drug or alcohol treatment program before but now he wants to all of the sudden. He has a clear ability to communicate and understand and I think he clearly understood the circumstances of this theft. Even if he wasn't the master mind, he was clearly the technical ability and was sought out for that which tends to lead any reasonable person to conclude that he either bragged about what he did nor what he could do or what his skills were. When you say he has skills, I think you're right and I think that's what he bragged about or talked about at his place of employment that led Mr. Lingerfelt to seek him out. He could do what needed to be done in this case and that tends to leave the Court to think that he is promoting himself as a criminal enterprise for additional money, additional income and that's the facts and circumstances surrounding this offense, and the nature of the circumstances and the criminal conduct involved. This was a calculated predetermined, preplanned theft made apparently many days or weeks in advance to come over here. He has no contact with this area. These folks are targeted specifically for what they own and what they've worked for. [The Defendant], and according to him, Mr. Lingerfelt, take what they've worked for and [the Defendant] had plenty of time to think about it, apparently a good long time, and I think he had plenty of time to brag about his ability to do it and he had plenty of time to think about, "Is this really something I need to be doing?" He could have backed out, he didn't have to go and had at least an hour in the car over here to say, "This isn't a good idea," but he never did that. He participated right on with it. His prior criminal history shows convictions as well as a lack of success on conditions of release. His previous actions and character really concern the Court because I think he was, quite frankly, evasive in his testimony today. He minimized, he wanted to act like somebody just found him at random. That didn't happen. These two (2) men had never met before. He promoted his skills, his reputation grew,

and Mr. Lingerfelt found him and that's exactly what he did, that's his character. His chances at rehabilitation, he has potential for rehabilitation but he was not paroled very long when he committed this crime. That is not a favorable factor for him either. It does not appear that he would abide by conditions of release as he has had his conditions of release revoked previously in his criminal history. The interest of society and being protected from future criminal conduct of [the Defendant], you know, he's available for hire . . . . he will steal what you have because he's good at it, it's known, he promotes himself as that, he wants to be known, that's his reputation, that's his marketing, that's his branding, he can steal. I've already addressed the fact that measures less restrictive than confinement have been applied to the [D]efendant, I won't say frequently, but recently, 2016, and this happened in 2017. You know, his prison sentence . . . in West Virginia . . . didn't get his attention at all, not at all. He was out just a short period of time and back committing very serious felony property thefts again. And I do think a full sentence of probation would depreciate the seriousness of these offenses when these folks were intentionally targeted, planned out, mapped out, absolute plan of action was implemented to steal. The offense was not enormous, gross or heinous. So pretty much all the factors weigh against [the Defendant] getting any type of probation. I find that his testimony was insincere. The circumstances of his release as he describes them [are] not encouraging to the Court. He has not indicated where he could work, what he could do, his mom has something lined up for him, he doesn't really know what it is, some temp service. He's never lived in Illinois, has no contacts there. He has no real plan other than he's going to let his mother take care of him. I know everyone has to have a place to live, but quite frankly, his plan for release is not thought out or impressive to the Court, he just wants out of jail. The Court finds that, again, he was not credible on his testimony about his involvement in this case, he minimized it and certainly minimized his promoting himself as a person who could pull off this sort of criminal enterprise, which I think it's absolutely a logical conclusion from his testimony and the facts of this case that that is exactly what happened. So the Court finds he is not an appropriate candidate for alternative sentencing and I do order that he serve his sentence.

It is from this judgment that the Defendant now appeals.

**Analysis**

On appeal, the Defendant contends that the trial court erred when it sentenced him. The State counters that the Defendant has waived this issue by failing to include the transcript of the guilty plea in the record, which prevents meaningful review of the issues. The Defendant admits his failure but contends that the record is sufficient for this Court to conduct a proper review. He further contends that the trial court abused its discretion when it denied him an alternative sentence because: (1) he was convicted of non-violent offenses; (2) he has a support system in place; and (3) the risk and needs assessment concluded that he was at low risk for reoffending. The State counters that the trial court found the Defendant's testimony "evasive" and "insincere" and found that he had previously failed to comply with the provisions of release in a prior conviction. The State contends that the evidence supports the trial court's decision to deny the Defendant alternative sentencing.

We first note that the Defendant has risked waiver by failing to include a transcript of the guilty plea hearing on appeal. *See State v. Keen*, 996 S.W.2d 842, 843-44 (Tenn. Crim. App. 1999) ("[A] transcript of the guilty plea hearing is often (if not always) needed in order to conduct a proper review of the sentence imposed."); *see also* Tenn. R. App. P. 24(b) (stating that the appellant has the duty to prepare a record which conveys a "fair, accurate, and complete account of what transpired with respect to those issues which are the bases of appeal."). Nevertheless, an appellate court will consider on a case-by-case basis whether a record is sufficient for review. *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). In the present case, we will consider the Defendant's sentencing issue on its merits, notwithstanding the absence of the transcript of the guilty plea, because the facts of the offense are stated in the presentence report.

The standard of review for questions related to probation or any other alternative sentence is "'an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act.'" *Caudle*, 388 S.W.3d at 278-79 (citing *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (2019) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a) (2018). A

defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-35-303(b); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

In the case under submission, the record supports the trial court's findings. The trial court based its decision to deny an alternative sentence in part upon the Defendant's criminal history, which included that he had violated his parole, was returned to incarceration, and was released from custody shortly before committing the offenses herein. Additionally, the trial court found the Defendant's testimony "evasive" and stated that he minimized his participation in these offenses. The presentence report shows multiple theft-related convictions. While the Defendant was eligible for probation, he failed to carry his burden of proving suitability for probation. The Defendant has not established that the trial court abused its discretion when it denied his request for an

alternative sentence, so he is not entitled to relief.  Accordingly, we affirm the sentences of incarceration imposed by the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE